**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

**Case No.** _____

EMILY TAYLOR,

         *Plaintiff*,

    v.

LUKE RANKIN, MARK WILLIS, JOHN MCCRAVY, and CRAIG GAGNON, in their individual and official capacities as South Carolina Representatives,

         *Defendants*.

**Complaint and Jury Demand**

Plaintiff Dr. Emily Taylor, by and through undersigned counsel, brings forth this Complaint and Jury Demand and alleges as follows:

**PRELIMINARY STATEMENT**

1.     In *National Rifle Association v. Vullo*, the U.S. Supreme Court unanimously reaffirmed that "[a] government official cannot coerce a private party to punish or suppress disfavored speech on [their] behalf." 602 U.S. 175, 190 (2024). Apparently, the Laurens Delegation missed the memo.

2.     On September 11, 2025, the day after Charlie Kirk was assassinated at Utah Valley State University, Dr. Emily Taylor—Director of the Women's and Gender Studies Department at Presbyterian College—published an essay in *Ms. Magazine* entitled "Dying to Be Men: American Masculinity as Death Cult." In it, Dr. Taylor wrote that "the violent discourse

espoused by Charlie Kirk and many others has resulted in his murder in front of a crowd of thousands of students."

3.    Defendant State Representative Luke Rankin was incensed by the article and called for Dr. Taylor's termination on X, writing "Actions have consequences. It's time for the college to do the right thing."

4.    When persuasion proved ineffective, the Laurens Delegation of the House of Representatives (comprised of Defendants Rankin, Willis, McCravy, and Gagnon) escalated to explicit coercion and intimidation.

5.    On September 30, Defendants sent a letter to the President and Board of Presbyterian College threatening to strip the school's state funding unless it fired Dr. Taylor.

6.    On December 18, Dr. Taylor and Presbyterian College caved to Defendants' threats and agreed that she would resign her post rather than risking the college's state-administered financial support.

7.    The same day, Defendant Rankin went on Facebook to spread the word. He posted: " 🚨 **BREAKING NEWS!!** 🚨 **Dr. Emily Taylor has RESIGNED. WE WON.**

8.    Defendants' conduct constitutes textbook, unconstitutional jawboning.[1] They are under no obligation to like Dr. Taylor's views or to stay silent about their opinions, but they cannot use their authority as state officials to suppress or retaliate against Dr. Taylor's speech.

9.    Here, because Defendants abandoned persuasion (which is protected by the First Amendment) and resorted to intimidation and coercion (which is prohibited by the First

---

[1] *See* Derek E. Bambauer, *Against Jawboning*, 100 Minn. L. Rev. 51, 57 (2015) (explaining that "[t]he term "jawboning" is Biblical in origin: Samson killed a thousand men using a seemingly weak tool -- a donkey's jawbone. Legal scholarship borrowed the concept first to denote informal pressures by Presidents and agency heads on recalcitrant bureaucracies, and more recently to stand for suasion through informal contacts by regulators generally, including members of Congress.").

Amendment) to retaliate against Dr. Taylor for her protected speech, they are liable for compensatory and punitive damages.

10.     Additionally, because Defendants' threats continue to chill Dr. Taylor's speech and mark her as a pariah within the South Carolina higher education system, she is entitled to preliminary and permanent injunctive relief.

## PARTIES

11.     **Plaintiff Dr. Emily Taylor** is a resident of Greenville, South Carolina. From 2012 until 2025, Dr. Taylor served on the faculty at Presbyterian College.

12.     **Defendant Luke Rankin** is a member of the Laurens Delegation of the South Carolina House of Representatives. He is sued in his personal and official capacities.

13.     **Defendant Mark Willis** is a member of the Laurens Delegation of the South Carolina House of Representatives. He is sued in his personal and official capacities.

14.     **Defendant John McCravy** is a member of the Laurens Delegation of the South Carolina House of Representatives. He is sued in his personal and official capacities.

15.     **Defendant Craig Gagnon** is a member of the Laurens Delegation of the South Carolina House of Representatives. He is sued in his personal and official capacities.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction over this Complaint under 28 U.S.C. § 1331 because it arises under the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

17.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District of South Carolina and because all parties reside in this District.

18.     Venue is proper in the Greenville Division under Local Civil Rule 3.01 because that is where Defendants do business and where a substantial portion of the events or omissions giving rise to the claims occurred.

**FACTS**

## I.    Dr. Taylor's Employment & Background

19.    Dr. Taylor earned a Ph.D. in comparative literature and a graduate certificate in Women's and Gender Studies from the University of Oregon in 2009.

20.    As a scholar, Dr. Taylor now specializes in Caribbean literature, postcolonial theory, and feminist theory.

21.    In 2012, Dr. Taylor was hired as an Assistant Professor at Presbyterian College. A year later, she became the director of the college's Gender and Women's Studies Program.

22.    In 2017, Presbyterian College awarded Dr. Taylor tenure and promoted her to associate professor.

23.    In 2025, Presbyterian College promoted Dr. Taylor to full professor, the highest rank that faculty can achieve.

24.    Dr. Taylor publishes frequently. Her scholarly articles appear in journals like *Southern Quarterly* and *Contemporary Women's Writing*, and *Journal of West Indian Literature*.

25.    Dr. Taylor also serves as a member of the editorial board for the *Journal of West Indian Literature*.

26.    In recent years, Dr. Taylor started writing and publishing for a broader audience. Dr. Taylor started her newsletter, *Hot Feminism: Letters From South Carolina*, in the wake of *Roe v. Wade*'s overturning.

27.    Dr. Taylor's goal with *Hot Feminism* was to apply her expertise in Women's and Gender Studies to local and state politics in South Carolina. In doing so, she hoped to help ordinary South Carolinians understand how the patriarchal structure impacts their lives.

28.    In her newsletter, Dr. Taylor frequently writes about—and critiques—South Carolina's legislators and their attempts to undermine the rights of women and the LGBTQ+ community. Her posts have covered voting legislation that would disenfranchise married

women,[2] legislative attempts to further restrict abortion,[3] and bans on gender affirming care for minors.[4]

## II.    Charlie Kirk and his Assassination

29.    Charlie Kirk was a conservative activist who, at the age of 18, founded Turning Point USA to organize young people "to restore traditional American values like patriotism, respect for life, liberty, family, and fiscal responsibility."[5]

30.    According to Kirk, he "founded Turning Point USA to take the fight for ideological diversity directly to a progressive stronghold: the nation's leading colleges and universities."[6]

31.    Kirk was known for expressing his views—including on divisive topics like race, gender, and guns—unapologetically and with overt disdain for "political correctness." He is known for comments like:

- "We need to have a Nuremberg-style trial for every gender-affirming clinic doctor. We need it immediately."

- "If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"

- "Reject feminism. Submit to your husband, Taylor [Swift]. You're not in charge."

---

[2] Dr. Emily Taylor, *Save Act Advances to the Senate*, Hot Feminism: Letters from South Carolina (April 11, 2025), https://hotfeminism.substack.com/p/save-act-advances-to-the-senate

[3] Dr. Emily Taylor, *SC Men Continue Trying to Pass a Complete Abortion Ban*, Hot Feminism: Letters from South Carolina (April 21, 2023), https://hotfeminism.substack.com/p/sc-men-continue-to-try-to-pass-a.

[4] Dr. Emily Taylor, *SC Legislature Goes Out on a Low Note*, Hot Feminism: Letters from South Carolina (May 3, 2024), https://hotfeminism.substack.com/p/sc-legislature-goes-out-on-a-low.

[5] *About*, Turning Point USA (last accessed Oct. 3, 2025), https://tpusa.com/about/.

[6] Charlie Kirk, *Conservatives Must Fight for Their Voice*, Salisbury Post (July 14, 2019), https://www.salisburypost.com/2019/07/14/charlie-kirk-conservatives-must-fight-for-voice/.

- "Islam is the sword the left is using to slit the throat of America."

- "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational."

- "I can't stand the word empathy, actually. I think empathy is a made-up, new-age term that does a lot of damage."[7]

- Haitians in Alabama "are raping your women and hunting you down at night."

32. On Wednesday, September 10, 2025, Kirk was shot and killed while speaking at an event at Utah Valley University.

33. Kirk's assassination caused an uproar, especially on social media. Some responses lionized Kirk as a paragon of civil debate, while others recalled speech by Kirk that they deemed harmful and balked at the idea of empathizing with a person who mocked the idea of empathy.

34. As the social media firestorm ignited, conservative groups started identifying and compiling posts by educators and other public employees that were critical of Kirk or that did not demonstrate sufficient sorrow over his death. The posts were then reposted and demonized by political leaders, who called for the employees to be terminated.

35. Journalists covering the backlash estimate that upwards of 600 people were fired or punished because of their social media posts about Charlie Kirk's death.[8]

---

[7] Chris Stein, *Charlie Kirk in His Own Words: 'Prowling Blacks' and 'the Great Replacement Strategy,'* The Guardian (Sept. 11, 2025), https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs.

[8] Raphael Satter, *The Charlie Kirk purge: How 600 Americans were punished in a pro-Trump crackdown*, Reuters (Nov. 19, 2025), https://www.reuters.com/investigations/charlie-kirk-purge-how-600-americans-were-punished-pro-trump-crackdown-2025-11-19/; John Semley, *More than 600 people were fired or punished for posting about Charlie Kirk's death. They want justice*, The Guardian (Feb. 17, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/feb/17/people-fired-punished-posting-charlie-kirk-death.

### III.    Dr. Taylor's Speech

36.    On September 11, 2025, the day after Charlie Kirk was assassinated at Utah Valley State University, Dr. Taylor published an essay on *Hot Feminism* entitled "Dying to Be Men: American Masculinity as Death Cult." The essay was also republished by *Ms. Magazine*.

37.    In it, Dr. Taylor wrote that "the violent discourse espoused by Charlie Kirk and many others has resulted in his murder in front of a crowd of thousands of students."

38.    The article concludes:

I'm sorry for Charlie Kirk and all the other men like him that have been raised in this America and with these ideals of masculinity. I'm sorry that he decided to adopt this hateful ideology and to profit from it. And as the mother to a boy and a girl, my heart breaks for the America these children are growing up in. Here's hoping we can save ourselves.

### IV.    Defendants' Retaliatory Threats

39.    Defendant Rankin reveres Charlie Kirk and was upset by Dr. Taylor's article.

40.    On September 16, Defendant Rankin called for Dr. Taylor's termination on X, writing "Actions have consequences. It's time for the college to do the right thing."

41.    On September 19, Rankin followed up on X: "Presbyterian College has informed me that Dr. Emily Taylor is on leave for the remainder of the academic year. I have requested clarification on whether this leave is paid or unpaid. Regardless, *I continue to insist on her immediate termination*," (emphasis added).

42.    In a radio interview on Straight Talk with Bill Frady, Rankin expressed his frustration over the College's refusal to yield to his pressure. "They are not only not going to fire her, they are not even going to issue an apology," he complained. "They are doubling down and I told them very clearly, I am not going anywhere on this issue. We're going to keep this front and center until they do the right thing."

43.    When Defendant Rankin's heavy-handed persuasion proved ineffective, the Laurens Delegation of the House of Representatives (comprised of Defendants Rankin, Willis, McCravy, and Gagnon) escalated from rhetoric to explicit coercion and intimidation.

44.     On September 30, Defendants wrote, signed, and sent a letter to Dr. Anita Gustafson, the President of Presbyterian College, and the school's Board of Trustees. In it, Defendants conveyed their "unequivocal condemnation" of Dr. Taylor's essay and explained that if the College did not immediately fire Dr. Emily Taylor, they would "reassess[] Presbyterian College's eligibility for state-administered financial support," including by passing a budget proviso excluding the college from receiving tuition assistance from the Higher Education Tuition Grants Commission. *See* Exhibit A (Sept. 30, 2025 Letter to Presbyterian College).

45.     Defendant Rankin was so proud of his threat that he published the letter to his Facebook account.

46.     On December 18, Dr. Taylor and Presbyterian College caved to Defendants' threats and agreed that she would resign her post rather than risking the college's state-administered financial support.

47.     The same day, Defendant Rankin went on Facebook to spread the word. "🚨 **BREAKING NEWS!!** 🚨 **Dr. Emily Taylor has RESIGNED. WE WON,"** he cheered.

48.     In the accompanied video, Rankin gleefully explained that Dr. Taylor's resignation "is a massive win," and that "we don't need these leftist, crazed, woke professors in the classroom." He recited how he put "the pressure" on Presbyterian College to fire Dr. Taylor and that, when that didn't work, he threatened to "file a proviso . . . that strips funding to Presbyterian College." "This is a huge, incredible win. I am so excited," he concluded, "Christmas just got a whole lot better."

## V.     Effects on Dr. Taylor

49.     Defendants' retaliation against Dr. Taylor caused her serious harm.

50.     To start, she lost her job as a tenured professor and Director of the Women and Gender Studies Department at Presbyterian College.

51.    With that, she lost her source of income, her ability to support her family, her source of professional and vocational satisfaction, and her treasured relationships with students and colleagues.

52.    The harm is persistent. Defendants (especially Defendant Rankin) were deliberately public with their threats to Presbyterian College, thus ensuring that any other South Carolina college or university is similarly dissuaded from employing Dr. Taylor. As a result, Dr. Taylor has struggled to find comparable work elsewhere in South Carolina.

53.    Dr. Taylor's speech is also chilled. Dr. Taylor has long written and published her views on contemporary matters of culture and politics. Now, she thinks twice before publishing her thoughts—worried that she might face further retaliation if her views stir the ire of Defendants.

## CLAIMS FOR RELIEF

### Count One

### First Amendment Viewpoint Discrimination and Speech Retaliation
### (AKA "Jawboning")

54.    The allegations in all previous paragraphs are incorporated as if fully stated herein.

55.    Dr. Taylor's article "Dying to Be Men: American Masculinity as Death Cult" is core political speech about matters of deep public concern. As a result, it "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

56.    Defendants pressured Presbyterian College to fire Dr. Taylor because they did not like the viewpoints she conveyed in that article.

57.    Viewpoint discrimination is *per se* unconstitutional. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (collecting cases). Thus, even if

Defendants found Dr. Taylor's article abhorrent, they have no authority to suppress its dissemination or punish Dr. Taylor for writing it.

58.     In 2024, the U.S. Supreme Court reaffirmed that "[a] government official cannot coerce a private party to punish or suppress disfavored speech on [their] behalf." *Vullo*, 602 U.S. at 190. By coercing Presbyterian College, a private party, to punish Dr. Taylor because of her speech, Defendants willfully violated clearly established law and acted with callous disregard for Dr. Taylor's First Amendment rights.

59.     On this claim, Plaintiff seeks declaratory, injunctive, and monetary relief under 42 U.S.C. § 1983. Plaintiff also seeks attorneys' fees and costs under 42 U.S.C. § 1988.

## RELIEF REQUESTED

a.  Declare that Defendants' threat to retaliate against Presbyterian College unless it terminated Dr. Taylor constituted unconstitutional First Amendment retaliation;

b.  Preliminarily and permanently order Defendants to rescind their letter and publicly disavow any and all retaliatory threats;

c.  Award back pay and lost benefits;

d.  Award compensatory and punitive damages against Defendants under 42 U.S.C. § 1983;

e.  Enter judgment for Plaintiffs and against Defendants;

f.  Award such costs and reasonable attorneys' fees as available by law, including under 42 U.S.C. § 1988; and

g.  Award such other relief as the Court may deem just and appropriate.


*- Plaintiff demands a jury trial on all issues so triable -*


**Dated: March 11, 2026**

Respectfully submitted,


*/s Allen Chaney*

Allen Chaney
ACLU OF SOUTH CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864) 372-6681
achaney@aclusc.org

Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
 7 Mills Avenue
Greenville, SC 29605
(864) 760-4000
josh@kendrickleonard.com


*Attorneys for Plaintiff*